CARTWRIGHT AND WILSON CONSTRUCTION COMPANY, A CO-PARTNERSHIP, APPELLEE, v. W. L. SMITH, APPELLANT.

52 N. W. 2d 274

Filed March 7, 1952. No. 33056.

*George B. Dent, Jr.,* for appellant.

*Baskins & Baskins* and *E. Leroy Shields,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiffs, Leon Cartwright and William E. Wilson, a co-partnership engaged in the construction of outdoor drive-in theaters, brought this action at law in the district court for Lincoln County against W. L. Smith, defendant, to recover the balance due it as commission on a written cost-plus contract. The cause was tried to a jury resulting in a verdict in favor of the plaintiff in

the amount of $2,485.71, and a finding against the defendant on his cross-petition. Motion for judgment notwithstanding the verdict and in the alternative for a new trial was filed by the defendant. This motion was argued and overruled. Judgment was entered on the verdict. The defendant appeals.

For convenience we will refer to Cartwright and Wilson Construction Company, a co-partnership, as plaintiff and the partners thereof by their names as occasion requires. The outdoor drive-in theater will be referred to as the theater, and W. L. Smith as the defendant.

There is no dispute that a written contract was entered into by and between the plaintiff and defendant on August 18, 1948, by the terms of which the plaintiff agreed to construct the theater for the defendant. The defendant agreed to pay the costs of the labor and material used in the construction. By the terms of the agreement defendant agreed to pay the plaintiff ten percent of the cost of labor and material used in the construction.

The plaintiff's petition alleged that the theater was completed on or about September 10, 1948; that the plaintiff complied with all the terms of the contract; that the total cost of the labor and material used in the construction of the theater was $52,244.85; and that the defendant paid the plaintiff $2,500 and was given credit for $238.77 which should be deducted from the plaintiff's commission which totaled $5,224.48. The plaintiff prayed for $2,485.71, with interest and costs.

The defendant's amended answer specifically denied all of the allegations of the plaintiff's petition not admitted. It was alleged that plaintiff held itself out to defendant as being expert in the construction of outdoor drive-in theaters and, relying on its representation and promises, oral and written, the defendant entered into the contract refered to in plaintiff's petition; that notwithstanding such representations and warranties on the part of the plaintiff, the plaintiff wholly failed to construct the theater in a workmanlike manner; that it

furnished incompetent help and supervision; that by the failure to construct the theater in a workmanlike manner and carry out the terms of the contract the defendant was damaged; that defendant did not discover that the work was done in an unworkmanlike manner until after he had paid certain sums of money to the plaintiff; and that by virtue of the unworkmanlike manner in which plaintiff constructed the theater, the defendant was put to large expense, and, in order to make temporary repairs to the ground where the theater is located and keep it in operation he was obligated to expend $1,954.75. The items constituting this amount appear in the amended answer and will not be set forth here as they appear in the evidence. The defendant further alleged that the screen was constructed in an unworkmanlike manner and had to be remodeled and reinforced at a cost of $1,000; that the ticket office was located at a place which made it inaccessible and it was necessary to move it at a cost of $192; and that defendant, in order to properly have the ground drain to permit operation of the theater, would be obligated to expend $4,650. These items are also set forth in the amended answer. In addition, the defendant expended $268 for labor at plaintiff's request.

In his cross-petition the defendant incorporated the substance of the foregoing allegations of his amended answer, reiterated the same subject matter therein, and prayed for $8,064.75 and costs.

The plaintiff's reply to the amended answer was a general denial, and plaintiff's answer to the defendant's amended cross-petition was a general denial.

In addition to what has been heretofore set out in reference to the contract it provided, in substance, that plaintiff was to construct the theater upon property designated by the defendant. The theater was to accommodate approximately 500 automobiles. The construction was to be performed upon specifications furnished by the defendant, which would include construction of an

appropriate screen tower, a projection room, confectionary, and ticket office, construction of roads and ramps, all roads and ramps to be graded and packed, plaintiff to do all painting and electrical work, to install adequate water and sewerage system consisting of a septic tank and cesspool, and plumbing facilities required by defendant. Plaintiff was to furnish a competent civil engineer to supervise the laying out of the roads, the grading, and other installations. The engineer was to be paid $150 a week. Services of the engineer were to be computed in the cost of the construction for the purpose of determining the ten percent commission. Defendant was to pay all bills for material and labor necessary in the construction of the theater. The cost of installation of sound and projection equipment and field speakers was to be included in determining the ten percent commission.

It appears from the record that Leon Cartwright and William E. Wilson were a co-partnership engaged in the business of constructing outdoor drive-in theaters since 1946. Leon Cartwright testified that he became acquainted with the defendant, W. L. Smith, who was desirous of having an outdoor drive-in theater constructed in North Platte. Prior to the time he became acquainted with the defendant his firm had constructed 10 or 12 such theaters. The defendant came to Greeley, Colorado, where his firm was constructing a theater. He and the defendant talked about the construction of a theater. As a result a contract was entered into. Leon Cartwright looked over the site which defendant had purchased. The other member of the firm, William E. Wilson, went to North Platte on August 19, 1948, to supervise the construction of the theater, and took some workmen with him, two of whom were Mr. Haynes and an elder Mr. Cartwright. The construction of the theater was practically finished and completed about September 10, 1948, and it was in operation by September 18, 1948. Wilson next saw the defendant in the early part of 1949.

On this occasion he and the defendant went over the bills evidencing the cost of the construction of the theater and certain payments made by the defendant. The items used in the construction and the total cost thereof were detailed by Wilson, the amount of the plaintiff's commission determined, and the payments made by the defendant.

At this point the plaintiff rested its case. The defendant moved for a directed verdict which was overruled, and will be discussed later in the opinion under one of the defendant's assignments of error.

The defendant then adduced evidence of a civil engineer familiar with the theater, who made a survey of the premises on November 17, 1950, in which he mapped the layout, the position of the screen, the ramps and the roads, and took levels to ascertain the slope of the land in order to perfect drainage to keep the theater in operation during the spring season. He detailed in what manner this work should be done, and concluded it would take 3,400 cubic yards of clay to fill the ramps and 1,000 cubic yards of gravel would be necessary to finish off the slope. He was unacquainted with the top soil or the condition of the land prior to the time he made this survey and estimate. The cost of the material and expense involved were testified to by the defendant.

A general contractor, familiar with the theater and the premises, was called out on the ground in June 1949. By an exhibit he identified the screen, testified to its condition, and that he placed it back in the condition in which it was before it was blown over by the wind. In January 1950, he was called again to put the screen in a workable and stationary condition. He explained how he reinforced it to make it substantial for the purpose for which it is used. He testified to the material used, the cost thereof, and gave an estimate of the cost of the labor necessary for the job. He further testified that the screen was not properly constructed. He had

not engaged in the construction of theater screens. It appears that this screen was blown down by the wind on two occasions, and the defendant was reimbursed by an insurance carrier to place the screen back in condition.

The defendant testified that he had operated the theater since it was completed, a period of 59 days in the fall season of 1948. He got the idea of constructing such a theater in the summer of 1948. He looked around at different theaters, looked for a location at North Platte, contacted Leon Cartwright, and later purchased a site in North Platte. Leon Cartwright came to North Platte and they looked over the 12 acres of ground which the defendant had purchased, walking across the entire area. There was one small place where the screen now sits where there was an indication of very little top soil remaining, which does not affect the theater site. They then proceeded to Denver to purchase equipment for the tower, which Leon Cartwright agreed to help him purchase. Subsequently, at Greeley, they entered into the contract. He noticed that part of the contract stated that he should furnish the plans and specifications. He told Leon Cartwright that he knew nothing about that kind of construction and had no plans. He was informed that that would make no difference. He took no part in the construction of the theater. Mr. Haynes came to lay out the ground for the theater. He surveyed the land and set the stakes for grading and for construction of the ramps. Haynes stayed in North Platte approximately two weeks, then informed the defendant that Leon Cartwright was going to send another engineer. The defendant indicated he was not satisfied, but Haynes left, as he was needed on another project. The man to replace him, Cecil Porter, came immediately and started the work where Haynes had left off. He stayed four days after the workmen left. Porter supervised the leveling and grading. The theater opened on September 18, 1948. Porter was there four days after the

opening. There were some finishing touches to be done on the ramps, and Porter was to supervise the spreading of the gravel.

After the theater opened it rained some ten days to two weeks. The ramps did not drain off. Water settled in puddles creating soft spots in the area, and automobiles would get stuck in them. The defendant contacted the plaintiff. He informed plaintiff about water standing in puddles around the ramps. Leon Cartwright called him and said he was so busy he could not make it, but he would send Haynes and a couple of workmen. Haynes and two workmen did come, but several weeks had elapsed and it was about the middle of December. The ground was frozen and they were unable to do any work at that time. The defendant paid $75 to Haynes, $45 to one of the workmen, and $48 to the other workman. In February 1949, Leon Cartwright came from Denver to inspect the theater. They walked over the premises and conferred about the drainage. Leon Cartwright said he would come in June and reconstruct the ramps. Defendant said that would be too late, as he wanted to open the theater and could not operate in a mudhole. Leon Cartwright told him to get the land surveyed, get the dirt haulers, and prepare the theater to open, and it would be deducted from what he owed the plaintiff. Pursuant to that instruction the defendant hired an engineer, the county surveyor, and paid him $58.45 to survey the ground. The defendant negotiated with a sand and gravel company for the use of heavy machinery and the work connected with it, and for hand labor. The amounts paid for this work appear in the record. He further testified that he had never been reimbursed for any of the work that had to be done. In the spring of 1949, Wilson came to see the defendant. They discussed the drainage and defendant informed Wilson it was not complete, that it was temporarily taken care of, and Wilson agreed to talk to Leon Cartwright about it. It rained that spring, cre-

ating puddles of water on the theater site and made it difficult to do the temporary work, and then in June the defendant had trouble with the screen.

The defendant detailed the work necessary to perfect the drainage for the operation of the theater; work done by himself and his son to improve the drainage; the amounts he paid, necessary to temporarily fix the theater site for operation of the theater; the items as set forth in the contract; the amount of the construction of the theater; the commission payable to the plaintiff; and payments made to plaintiff by him.

One witness who lived in close proximity to the theater and sold the land to the defendant testified with reference to the top soil on this 12 acres, the manner in which the ramps were constructed, the leveling of the dirt, what had to be done to place the theater so that it could be operated, and detailed the drainage and expense incident to it. There was also evidence to the same effect by other witnesses who were either on the ground or worked there, and evidence of defendant's wife to the effect that Leon Cartwright told her husband to go ahead and get the ramps fixed up and the drainage corrected.

Leon Cartwright was recalled and testified that the theater was to be constructed similar to the one in Greeley, Colorado. In December 1948, this witness had learned while in Denver that the defendant was not satisfied with plaintiff's work, so he went to North Platte. He contacted the defendant and they looked over the theater property. Defendant told him that he was not satisfied with the ramps. The ground was frozen and no work of any consequence could be done at that time. Leon Cartwright told the defendant he would have Haynes come down. Haynes did come. He looked over the theater property with the defendant who complained because the ramps were not draining the water properly. Haynes checked the grade stakes and there was not over three inches variation from the

grade as fixed originally. There were some chuck-
holes which caused a "washboard" condition and created
a maintenance job. The defendant was so informed.

When Haynes first arrived on the job on August 19,
1948, he went over the ground with the defendant and
told the defendant he was not satisfied with the type
of soil. The top of the soil was scraped off and there
was nothing left but beach sand which is not suitable to
build on for theater purposes. He suggested that the
defendant acquire other property and he would be glad
to assist him. The defendant replied that he had this
property. It was apparent that he wanted the theater
built on it and to get it done as cheaply as possible.
There was also a conversation between Haynes and the
defendant about the tower to the effect that Haynes
did not believe the ground would hold the tower up.
The defendant replied that he had spent the money and
was going to build a drive-in theater, and to continue
with the construction. When Haynes left the majority
of the fill had been completed and the entrance road,
the exit road, and the ramps had been completed. The
spread for the gravel was also fixed before he left.
There was no occasion for him to remain. He was fol-
lowed by Porter who was more or less a grading fore-
man and able to operate the machinery incident to that
kind of work when occasion required. Also, when
Haynes left the theater was 85 or 90 percent completed,
just the distribution of the gravel remained to be done.

C. H. Cartwright, an uncle of Leon Cartwright, worked
on the project. He arrived in North Platte on August
19, 1948, and was foreman of the screen tower. He had
constructed screen towers previously, and had a regular
pattern for such construction. He testified to the con-
versation had between Haynes and the defendant with
reference to the suitability of the ground for theater pur-
poses. He was also present with Leon Cartwright and
Mr. Knox on December 11, 1948, when they, together
with the defendant, went to the theater site. The screen

at that time was in good condition. The tower was "setting good and tight." There was no complaint by the defendant with reference to the top of the ramps. There were some chuckholes where car wheels had sunk into the ground. He had not seen the screen when it was damaged by wind. He noticed that it had been reinforced.

William E. Wilson testified that he arrived in North Platte on August 19, 1948, and superintended the project which included constructing the tower and grading and leveling the land. He testified to the conversation had between the defendant and Haynes with reference to the suitability of the land for theater purposes; and that Haynes seemed to believe it would be quite impossible to build ramps with nothing but sand as a base and to haul dirt to mix with the sand would create a great deal of expense. Defendant, on the other hand, believed that the expense would be less, as he owned the land and to buy another site would incur more expense. Wilson had something to do with the moving of the ticket office, and explained why the defendant wanted it moved. The ticket office was not completed, and the moving was about a two-hour job. The tower was substantially like the one built in Greeley. He attended the opening of the theater and remained three or four days thereafter. He was also in North Platte in the spring of 1949 and interviewed the defendant. They went over the worksheets, the bills, and the payrolls to arrive at the cost of the materials. He made a demand on the defendant to pay the balance due the plaintiff, which defendant refused to pay.

The defendant assigns as error that the verdict of the jury is invalid for the reason it was concurred in by only ten members and was returned into court before the jury had an opportunity to deliberate and consider the case for a period of at least six hours, as required by law.

The record discloses that the case was submitted to the

jury at 4:30 p. m., on March 14, 1951. The jury then deliberated until 6 p. m., when it was taken to dinner at a local cafe by the bailiff. Approximately one hour elapsed from the time the jury left the jury room until it returned to the jury room after dinner. The jury advised the bailiff it was ready to return a verdict at 10:45 p. m., at which time the court and counsel for the respective parties were notified. At the instruction of the court the jury was brought into open court and delivered its verdict at 10:50 p. m.

Article I, section 6, of the state Constitution provides the Legislature may, by general law, authorize a verdict in civil cases in any court by not less than five-sixths of the jury. In accordance with the constitutional authorization the Legislature enacted a law which is now section 25-1125, R. R. S. 1943, providing in substance that where five-sixths of the members of a jury concur in a verdict it will have the same validity as if all members of the jury concurred therein; and that a verdict concurred in by less than all the members of the jury shall not be rendered until the jury shall have an opportunity for deliberation and consideration of the case for a period of not less than six hours after the same is submitted to said jury.

The defendant contends it appears that the jury in the instant case actually deliberated for a period of five hours and twenty minutes, and no more, therefore, the verdict returned by the jury was in violation of the statutory provision cited.

This court has not had occasion to pass directly upon this proposition. We believe the case of Hurlburt v. Leachman, 126 Minn. 180, 148 N. W. 51, is applicable and decisive on this point. The appellant contended the jurors had been removed from the jury room for the purpose of obtaining their meals and also for the purpose of sleeping, and that considering such facts. the jury did not have an opportunity to deliberate on the case the full 12 hours as required by law. The court

reasoned that during retirement the jurors are presumed to be properly performing their duties. Their deliberations are not necessarily confined to discussion or debate with each other. While such are essential to a proper consideration of matters concerning which there is a difference of opinion, a juror may deliberate as wisely and to as good effect when he is considering and weighing the evidence in his own mind as when he is pressing his conclusions upon his fellows. The court assumes that the jurors are deliberating while in retirement for the purpose of determining and arriving at their verdict, and will make no inquiry into the nature or extent of such deliberation. The court held that the length of time devoted to meals and sleep while the jurors are deliberating upon their verdict cannot be shown for the purpose of proving that they did not deliberate for the prescribed length of time.

We conclude that the defendant's assignment of error is without merit.

The defendant contends that the plaintiff failed to sustain the burden of proof for the reason that the defendant's answer denied generally the allegations of plaintiff's petition and, in addition, specifically pleaded certain facts to show wherein the plaintiff breached the contract. The duty then devolved upon the plaintiff to establish by competent evidence substantial performance of the contract, which it failed to do. In proving substantial performance of the contract it was incumbent upon the plaintiff to prove all of the items contained therein which constituted conditions precedent. The proof adduced by the plaintiff before the defendant made his motion for directed verdict was as follows: The plaintiff proved the execution of the contract; that pursuant to the contract the theater was constructed as provided for therein and the contract completed; that the cost of constructing the theater was $52,244.85; that there was due plaintiff $2,485.71 on the contract; and that defendant accepted the theater and proceeded to operate it.

Section 25-836, R. R. S. 1943, provides: "In pleading the performance of conditions precedent in a contract, it shall be sufficient to state that the party duly performed all the conditions on his part; and if such allegation be controverted, the party pleading must establish on the trial the facts showing such performance."

If the defendant relies upon nonperformance of the contract by the plaintiff, he must allege that fact in his answer, and in pleading nonperformance, the facts which constitute the breach must be alleged. Where by statute, as in this state, the plaintiff is authorized to plead general performance of all conditions precedent, the defendant must, if he relies upon the fact that any of the conditions precedent have not been performed, set out specifically the condition and breach. See, Peters v. Wilks, 151 Neb. 861, 39 N. W. 2d 793; Morearty v. City of McCook, 119 Neb. 202, 228 N. W. 367; Davidson v. First American Ins. Co., 129 Neb. 184, 261 N. W. 144; § 25-836, R. R. S. 1943.

As stated in Morearty v. City of McCook, *supra*: " 'In pleading such nonperformance, the facts which constitute the breach must be alleged, and the breach assigned must conform to the terms of the contract. * * * Where by statute plaintiff is authorized to plead a general performance of all conditions precedent, defendant must, if he relies on the fact that any of the conditions precedent have not been performed, set out specially the condition and the breach, thus confining the issue to be tried to such particular condition or conditions precedent as he may indicate as unperformed.' "

Under the cited authorities, a general denial raises no issue as to any of the conditions precedent, and the plaintiff is not required to make affirmative proof on these issues.

Without restating the allegations of the defendant's answer in addition to the general denial contained therein but making reference to it, it is apparent that nonperformance is not pleaded, as required by the cited authori-

ties. In this state of the record it was not incumbent upon the plaintiff to prove all of the separate items constituting conditions precedent to the contract, as contended for by the defendant.

It appears to be the rule where a contract has been substantially performed, as the evidence discloses in this case and the theater accepted, the measure of damages to the accepter would be the cost of remedying the defects. Morearty v. City of McCook, *supra*, wherein it is said: "And we remain satisfied with the further instruction to the district court in connection therewith that the measure of damages would be 'the cost of remedying the defects.' " See, also, Morearty v. City of McCook, 117 Neb. 113, 219 N. W. 839; Library Board v. Ohlsen, 110 Neb. 146, 193 N. W. 110.

In the light of the foregoing authorities, we conclude the trial court did not err in overruling the defendant's motion for a directed verdict.

The defendant requested an instruction to the effect that under the law of this state an engineer, before practicing his profession, must meet certain qualifications and be licensed to practice in this state, and that the fact that the engineer furnished by the plaintiff was not a licensed civil engineer in this state may be taken into consideration in determining whether or not the plaintiff breached the contract and performed the engineering work in a negligent and incompetent manner. The contract provided that the plaintiff was to furnish a competent engineer. The defendant did not specifically plead in his amended answer and cross-petition the failure of the plaintiff to furnish a competent licensed engineer as a condition and breach of the contract. As heretofore pointed out, no breach of the contract became an issue in this case. The evidence shows that the plaintiff substantially performed the contract. The defendant accepted the theater and began to operate it. Whether or not the engineering work was done in an unworkmanlike and negligent manner, as pleaded in the defendant's

amended answer and cross-petition, became a question for the jury to determine under the instruction on the measure of damages as it applies to the defendant. We conclude the trial court did not err in refusing the requested instruction.

The defendant requested an instruction to the effect that plaintiff held itself out as expert in the construction of outdoor drive-in theaters, and it was for the jury to consider whether or not the plaintiff performed its services in a workmanlike manner and as an expert in that field. The defendant pleaded such facts in his amended answer and cross-petition. From an analysis of the evidence, the defendant complained of the construction of the screen and the drainage on the theater site. In any event, evidence was before the jury for its determination as to whether or not the plaintiff performed its services in a workmanlike manner. The items constituting what the jury might take into consideration in such respect appear in another instruction which will be referred to later on. We find no error in the court's refusal to give the requested instruction.

The defendant requested an instruction which comprised certain items of expense to which he was put to place the theater in temporary operation, and also an amount of $100 which was paid to an employee of the plaintiff, for which it was acknowledged he should receive credit. The items constituting the basis of this instruction were before the jury and are related in defendant's amended answer and reiterated in his cross-petition, and the jury had the full benefit of this evidence to determine whether the amount should be credited to the defendant in the event he should recover. We believe, under the circumstances, the trial court did not err in refusing the requested instruction.

The defendant requested an instruction to the effect that evidence had been introduced with reference to the screen not being properly constructed and it was necessary for him to expend money to reinforce the

screen, and the jury, if they found the screen not to be properly constructed could determine from the evidence the fair and reasonable costs of properly reinforcing the screen, and give the defendant credit for such sum. The screen was constructed on a standard pattern as screens of that type. The evidence shows that on two occasions it had been damaged by the wind and reconstructed. In any event, the evidence was before the jury for its consideration, to determine whether or not the defendant should receive credit for the sum so expended. Specifically, in another instruction the court set out the items that the jury might take into consideration in determining if the defendant should recover. The screen was included therein. We find no error in the court's refusal of the tendered instruction.

The defendant predicates error on the giving by the trial court of instruction No. 2. This instruction set out the burden of proof required of the plaintiff before plaintiff would be entitled to recover. The defendant's main contention is with reference to exhibit A attached to the plaintiff's petition, which is a copy of the contract, and exhibit No. 1 introduced in evidence, which is the contract, and to which no objection was made. Defendant contends that there is no showing that exhibit A and exhibit No. 1 are the same instrument, that is, the contract. We find no merit to this part of defendant's contention. The contract is in evidence. No objection was made to its introduction. It was accepted as the only contract between the parties. With reference to the burden of proof on the plaintiff as appears in this instruction, it is the only instruction the court could properly give on the subject on the issues joined herein. The defendant's assignment of error cannot be sustained.

The instruction on the measure of damages given by the trial court was whatever amount of damage the defendant had established by a preponderance of the evi-

dence, after deducting whatever amount is due the plaintiff under its contract, if any. The instruction said: "In considering the amount of damages, you must take into consideration any improper construction in the building of the screen tower, if any, projection room, confectionary and ticket office, roads, ramps, grading and drainage, and other evidence introduced in this case relative to said matters." There is no objection made by the defendant as to the measure of damages, and on the issues as joined the measure of damages was properly instructed upon.

Defendant predicates error on the giving by the trial court of instruction No. 6, which is the instruction on the burden of proof required of the plaintiff before the plaintiff may recover. This instruction is proper in form and in compliance with the burden of proof required of plaintiff in this case on the issues joined.

The defendant predicates error on the giving by the trial court of instructions Nos. 10 and 11. Instruction No. 10 referred to what the jury might consider in determining whether or not the plaintiff should recover, and No. 11 was an instruction on the burden of proof required of the defendant on his affirmative defense based upon his cross-petition, and included what the jury might take into consideration in determining if the defendant be entitled to recover. This consisted of the building of the screen tower, the projection room, confectionary, ticket office, roads, ramps, grading and drainage, and other evidence introduced in this case relative to such matters. In instruction No. 10, the word "preponderance" does not appear before the word "evidence," while in instruction No. 11, the word "preponderance" does appear before the word "evidence." Therefore, the defendant contends that a greater burden is placed upon the defendant in proving his affirmative defense, as pleaded in his cross-petition, than upon the plaintiff. We have heretofore stated that the trial court, in a previous instruction, set forth the burden of proof

required of the plaintiff before it could recover, and made reference that the plaintiff must so prove by a preponderance of the evidence. There is no merit to the defendant's assignment of error.

The instructions to the jury in this case, when considered and construed together, fairly state the law applicable to the issues raised by the pleadings and proofs. See, O'Dell v. Goodsell, 152 Neb. 290, 41 N. W. 2d 123; Barton v. McKay, 36 Neb. 632, 54 N. W. 968.

Other assignments of error need not be discussed.

We conclude that the verdict of the jury and the judgment entered thereon by the trial court is correct and should be, and is hereby, affirmed.

AFFIRMED.