ANNA PAUL ET AL., APPELLANTS, V. BRYAN T. MCGAHAN
ET AL., APPELLEES.

42 N. W. 2d 172

Filed March 30, 1950.   No. 32699.

*Kirkpatrick & Dougherty,* and *George B. Hastings,* for appellants.

*V. H. Halligan,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiffs brought this action in equity to establish a constructive trust on lands owned by William McGahan at the time of his death; to set aside a conveyance made by the plaintiffs to Bryan T. McGahan, administrator with the will annexed and an heir of the deceased, which conveyance plaintiffs charge he procured by fraud and misrepresentation; and to appoint a testamentary trustee to carry out the provisions of the will of William McGahan, deceased.

For the purposes of this appeal the plaintiffs' amended petition alleged facts upon which they based their contention that a constructive trust was created. The facts alleged testified to, or so much thereof as may be necessary to a determination of this appeal, will be set forth in the opinion.

The allegations of the plaintiffs' amended petition allege in substance: That the defendant Bryan T. McGahan, in anticipation of his probable appointment as administrator with will annexed of his deceased father's estate, procured the plaintiffs to execute, acknowledge, and deliver to him a certain quitclaim deed conveying to him the real estate of which his father died seised and possessed. That the deed was without consideration, and was delivered to said defendant at his own express insistence and request and upon his representation to the plaintiffs that the immediate signing and delivery of the deed was necessary and was to serve only as an instrument to facilitate his management and administration of the estate and to protect the assets thereof, and with the promise and assurance upon his part to them that when the estate was settled it would be divided amongst and between all of the decedent's devisees as provided in the last will and testament. That the plaintiffs trusted and reposed confidence in this defendant and in his statements and representations as above set forth, and assumed and relied upon his good intentions as expressed by him that during the ten-year interim as provided for in the second paragraph of the decedent's will, he would faithfully fulfill his obligations as trustee as provided therein.

The answer of the defendant Bryan T. McGahan generally denied the allegations of the amended petition relating to the oral contract as set forth therein, and pleaded facts as to the agreement made by the heirs of William McGahan, deceased, wherein the real estate was conveyed to him for his use absolutely. The answer of the defendant John C. McGahan was to the same effect.

The plaintiffs' reply was a general denial of the allega-

tions of the answers of the defendants with respect to defendants' contentions as to the oral agreement.

William McGahan, a widower and resident of Perkins County, Nebraska, departed this life March 20, 1941. He was survived by Anna Paul and Mayme Baker, his daughters, John C. McGahan, Matt J. McGahan, and Bryan T. McGahan, his sons, who are the persons having an interest in the subject matter of the litigation, therefore other parties are not named in the opinion. At the time of his death he owned 496 acres of land located in Perkins County and described in the pleadings.

Anna Paul, Mayme Baker, and Matt J. McGahan appear as plaintiffs, and Bryan T. McGahan and John C. McGahan as defendants.

At the close of the plaintiffs' testimony the defendants moved to dismiss the plaintiffs' petition for the reason that the evidence introduced by plaintiffs was insufficient to sustain a cause of action against the defendants. Plaintiffs moved that the court enter judgment for them in accordance with the prayer of the amended petition. The trial court sustained defendants' motion and dismissed plaintiffs' action. Motion for new trial was filed by the plaintiffs and overruled. Plaintiffs appeal, predicating error on the trial court's part in sustaining defendants' motion on the 'ground that the evidence was insufficient in fact and in law to sustain a prima facie case.

Constructive trusts arise from actual or constructive fraud or imposition, committed by one party on another. Thus if one person procures the legal title to property from another by fraud or misrepresentation, or by an abuse of some influential or confidential relation which he holds toward the owner of the legal title, obtains such title from him upon more advantageous terms than he could otherwise have obtained it, the law constructs a trust in favor of the party upon whom the fraud or imposition has been practiced. If a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according

to the rules of equity and good conscience as administered in chancery, hold and enjoy the benefits, out of such circumstances or relations, a court of equity will raise a trust by construction and fasten it upon the conscience of the offending party and convert him into a trustee of the legal title. See Pollard v. McKenney, 69 Neb. 742, 96 N. W. 679, 101 N. W. 9.

This case comes to this court for trial de novo subject to the rule that when defendant moves to dismiss plaintiff's action at the close of plaintiff's evidence, the defendant thereupon admits the plaintiff's testimony to be true, together with every conclusion which may fairly and reasonably be drawn therefrom. The court must thereupon determine, as a question of law, whether plaintiff's evidence is sufficient to support a judgment for the plaintiff. See Meyer v. Platt, 137 Neb. 714, 291 N. W. 86. See, also, Schroeder v. Bartlett, 129 Neb. 645, 262 N. W. 447; Lucas v. Lucas, 138 Neb. 252, 292 N. W. 729; Caspers v. Frerichs, 146 Neb. 740, 21 N. W. 2d 513; Casper v. Frey, *ante* p. 441, 41 N. W. 2d 363.

The record discloses that at the time of the death of William McGahan the land in question was mortgaged in the amount of $7,500 to the Federal Land Bank of Omaha.

On September 5, 1935, William McGahan made and executed a will. For the purposes of this appeal the will provided: "I further direct that the remaining real estate of which I die seized (seised), be kept in trust for a period of 10 years. At that time, I authorize, empower and direct, my executor, hereinafter appointed to sell either at public auction or private sale, as he may deem for the best interests of my estate, and without order from the Court, all of my * * * real estate, * * * of which I die seized (seised), and said sale I direct to be made by my executor, as appears to him to be for the best interests of all parties concerned." The will then provides that at that time the proceeds of the sale be divided share and share alike between the living sons and daughters, and names them. The will provides further: "For the purpose of

carrying out my intentions, and for the best interests of preserving the value of my estate, I further authorize, empower, and direct that during the time of the 10 years that my estate is kept in trust, my executor, * * * make or have made, all necessary repairs, all property sufficiently insured, all taxes paid, all interest on mortgages and loans paid, from the proceeds and/or rentals * * *. In the event of the death, removal, resignation or renunciation of my executor, hereinafter appointed, all the powers herein conferred upon him, may be exercised by an Administrator with the Will annexed."

The sons and daughters of the deceased were present at their father's funeral. They did not at that time discuss the estate of their father or any matter with reference to it. The sons paid the burial expenses.

The testimony is also to the effect that the sons and daughters have a limited education and are unacquainted generally with legal matters, the daughters being unacquainted also in business matters.

Matt McGahan testified that previous to and at the time of his father's death one Leon McQueen was the tenant on the farm. In April 1941, Matt and Bryan had a conference about their father's estate. Bryan wanted to buy the land for the amount of the encumbrance against it. Matt thought it was worth more money. As a result of this conference they went to Ogallala to consult the agent of the Federal Land Bank. He informed them that the land was not productive and was of little value. Nothing was said about foreclosing the mortgage against the land. Matt and Bryan also talked about getting McQueen off the land, and as a result of this conversation they went to Grant to consult an attorney. Matt wanted Bryan appointed administrator. It was suggested that the matter might be handled by having the heirs deed their interests in the land to Bryan.

Matt further testified that Bryan agreed to take the land, get McQueen off and put his son on it, and by the use of the land try to pay off the indebtedness against

it before offering their father's will for probate, and that after the encumbrance against the land was paid, the land would be sold and the proceeds of the sale would be divided equally among the heirs. Matt relied upon this agreement made by Bryan and had a deed prepared which was executed and delivered to Bryan. Matt knew that his father had made a will, he was informed so by the scrivener and by his father. He did not know the contents of the will. He signed a declination to serve as executor of his father's estate, which was filed in the estate proceedings. Bryan was appointed administrator with will annexed September 29, 1941.

On May 21, 1947, Matt and his wife went to Bryan's home, Matt for the purpose of inquiring about the estate. Bryan told him that he knew what he had come for, and that he would get his share of the estate but that his sisters would not get their shares. Matt took issue with Bryan about the sisters' shares and was ordered from the premises.

In the winter of 1947, Matt had a conversation with Bryan about their brother John who was suffering from an asthmatic condition, and Bryan told Matt there were sufficient funds in the estate to send the brother John to Arizona for his health.

On cross-examination Matt testified that he had kept his father who was without personal funds for a number of years until his death. He believed the encumbrance against the land to be about $6,800, and the indebtedness in arrears $800. He did not want to act as executor of his father's estate for the reason that he felt the heirs would not get along with each other. His father and Bryan were indebted to him in large amounts. He was informed by the Bakers that his sister Mayme had borrowed $100 from Bryan on her share of the estate. He wrote two letters in December 1946, to the agent of the Federal Land Bank to the effect that his sisters would like to sell their shares, but the heirs did not want to sell the place out of the family and that he and Bryan would buy the sisters'

shares. He asked how much there was an acre against the land. In the letter of December 24, 1946, he wrote that the heirs had conveyed their interests in the land to Bryan as "times were tough"; that no money changed hands by the conveyances; that they did not want to sell; and that no shares of the heirs had been purchased by any other heir. He was aware that Bryan had borrowed $900 from his wife's people to take care of estate matters. McQueen had offered to take over the land for the amount of the encumbrance against it, and the heirs did not favor him having it. He had signed an affidavit that he was acquainted with the signatures of the witnesses to his father's will, but he had not seen the original will nor did he know the contents of it until it was read to him by an attorney who brought it to his house in September 1947. He had received no accounting of the estate from Bryan and did not know that Bryan claimed absolute title to the land until 1947.

Lena McGahan, the wife of Matt McGahan, corroborated his testimony that Bryan said Matt would get his share of the estate but that the girls would not get any part of the estate.

Anna Paul testified that she was employed as a domestic in Omaha. In the spring of 1941, Bryan sent her a letter with a deed enclosed. In the letter he asked that she sign the deed and return it to him, and stated that she should not be afraid to sign it as no part of her interests would be affected, it was for the purpose of having him appointed administrator. He enclosed five dollars for expenses. Without consulting anybody about signing the deed, she signed, acknowledged, and returned it to Bryan by mail. She further testified that she wrote Bryan three or four times a year with reference to the estate and the condition of the mortgage. She received no reply or accounting from him. The first she heard that Bryan claimed the land as his absolutely was in 1947. She wrote Bryan about the estate, received no reply, and then wrote to

Matt asking him about it. She also wrote to an attorney in Grant. From the attorney she received a copy of the will. She contracted to employ counsel in a suit against Bryan. After the suit was commenced, Bryan came to Omaha and talked to her about the estate. He promised to settle with her for $2,000, and pay her $1,000 either in the spring or fall. He did not want her to sue him because he could not pay for the accumulated rents and profits. Later he came with a paper which he asked her to sign. This was an affidavit to the effect that she disclaimed any interest in the land, did not employ counsel to represent her in the suit, and asked dismissal of the case with prejudice. She testified that she did not read the instrument, nor was it read to her. However, she signed it.

On cross-examination she testified that she had written Bryan to the effect that she was happy that McQueen was not getting the land and that Bryan was, and that she was having a religious service held for him. In October 1947, she wrote Bryan with reference to perfecting settlement of the suit out of court, and of the views of the attorneys representing her about the suit.

Mayme Baker testified that she was a housewife; that the first she heard about her father's estate was when she received a letter from Bryan in which he enclosed a quitclaim deed; and that he requested her to sign the deed to enable him to get money to pay off the debts of the estate and said that he was not taking her share of the estate from her. In the letter he wrote that after everything was settled the estate would be divided and the heirs would each get their share. She wrote requesting $100 to pay a hospital bill, this amount was to be taken out of her share of the estate. She signed and acknowledged the deed and gave it to her husband to deliver to Bryan. The first she knew about the provisions of her father's will was after the suit had started when the attorney representing her brought her a copy of the will. She had never received an ac-

counting from Bryan nor had she written him with reference thereto. She also testified that Bryan and an attorney came to her house after the litigation had started. They talked about the estate. As a result of this conversation she went with them to another attorney's office where an instrument was prepared wherein she disclaimed any interest in the estate and asked that the suit be dismissed with prejudice, and that she had not employed counsel to represent her in the case. She did not remember whether the instrument was dictated in her presence nor if she was asked to read it, nor if she said it was all right. Her evidence is in conflict with reference to the employment of counsel to represent her, and as to what was said at the time she signed the dismissal of the action with prejudice.

Don Baker, Mayme's husband, testified he had seen the letter in which the deed was enclosed, and he corroborated Mayme's testimony as to its contents. He delivered the deed to Bryan and received the $100. No demand was ever made thereafter for the payment of the $100, and no offer to pay it was made by his wife. In conversations he had with Bryan about the estate, Bryan did not know in what manner the loan could be handled, whether it could be renewed or another loan obtained until it was partly paid off, but when the land was sold the heirs would get their equal shares. He further testified that he handled his wife's business, and Bryan had made no accounting of the rents and profits received from the land.

The motions to dismiss with prejudice filed in this case by Anna Paul, Mayme Baker and Don Baker, were set aside upon motion to reinstate the action. John C. McGahan, as plaintiff, filed a motion to dismiss the petition with prejudice to any further action. As previously stated, he filed an answer in this case as a defendant.

The final decree of the county court filed January

18, 1943, decreed the lands to the five heirs as tenants in common, in equal shares. The personal property was decreed in the same manner, subject to a lien in favor of Bryan T. McGahan in the sum of $1,393.53 as evidenced by his final accounting from September 29, 1941, to December 1, 1942, as administrator with the will annexed.

A review of the evidence discloses that Bryan T. McGahan did not take any affirmative action to notify the other heirs of his deceased father that he claimed absolute ownership of the land constituting the estate until 1947. It is apparent that he made the oral agreement as pleaded in the plaintiffs' amended petition, and the heirs, in performance of the agreement on their part, conveyed to him their respective interests in the land. He endeavored to settle with one of the heirs for her share in the estate, and promised a settlement and payment of the amount she claimed, which he did not fulfill. He procured from two of the heirs disclaimers of any interest in the land and a dismissal of the suit with prejudice, which the court set aside, apparently for the reason that these heirs were not apprised of the effect of a dismissal of the suit with prejudice or of their rights in such respect, or that they were waiving any interest they might have in the estate. He informed the heirs at the time the conveyance of their interests was made to him that they were not signing away or disposing of any interest they might have in the estate. He promised the heirs they would get their respective shares of the estate, as provided for by their father's will. We deem it unnecessary to summarize the evidence further.

Being mindful of the rule heretofore set out, when defendant moves to dismiss plaintiff's case at the close of the plaintiff's evidence, the defendant thereupon admits the plaintiff's testimony to be true, together with every inference which may fairly and reasonably be drawn therefrom, we conclude, in the light of this

rule and from the plaintiffs' evidence and the authorities cited, the plaintiffs have made a prima facie case.

There is no doubt but that the defendant Bryan T. McGahan is entitled to test the sufficiency of the plaintiffs' evidence without the risk of penalizing himself in the event the trial court improperly sustained his motion to dismiss the plaintiffs' cause of action. In an equity suit, a motion to dismiss at the conclusion of the plaintiff's evidence affords a proper means of determining the sufficiency of the plaintiff's evidence to make a prima facie case.

Where the trial court erroneously sustained the defendant Bryan T. McGahan's motion to dismiss the plaintiffs' cause of action at the conclusion of the plaintiffs' evidence, both parties are entitled to be placed in the same position they were in before the error occurred, which requires the cause to be remanded for a new trial. See Lucas v. Lucas, *supra*.

We hold the trial court erred in sustaining the defendant Bryan T. McGahan's motion to dismiss the plaintiffs' cause of action, and the cause must be, and is, remanded for a new trial.

REVERSED AND REMANDED.